Case number 225808, Philip Truesdell et al. v. Eric Friedlander et al. Oral argument not to exceed 15 minutes per side, with 15 minutes to be shared by the appellees. Mr. Polk, you may proceed for the appellants. Good morning. Good morning, Your Honor. I will reserve three minutes for rebuttal. Very well. May it please the Court, for several years, Mr. Truesdell and his family ambulance business have been operating successfully in Ohio, less than a mile away from the Kentucky border. But despite being only a stone's throw away, they are currently prohibited from practicing in Kentucky due to a protectionist law that allows incumbent providers to veto new competition in violation of the Commerce Clause. The Cabinet and Intervenor, a private ambulance service currently benefiting from this system, are sharing time today to justify this protectionism on a basis that was squarely rejected by the Supreme Court in its CNA Carbone case, and that is the protection of the revenues of locally subsidized providers. Despite Intervenor being a private service... So for Carbone, it was an absolute monopoly to an instator. Here it just shifts competition in some respects forward. So you have to... It's no... Everybody can compete for a certificate of need, and maybe there's an incumbent advantage, because once you get that, you're able to restrict others from entering the market. But the competition for certificates is open to everybody. There's no in-state versus out-of-state discrimination in the same way there was in Carbone, where it was basically a monopoly to one entity, which was in-state. Well, Your Honor, in order to succeed on a Commerce Clause claim where there is a discriminatory purpose that's been asserted by the government, you need not show that there was a total ban on out-of-state competition, only that there was a discriminatory purpose against interstate commerce, which there was in Carbone. There are many cases where the Supreme Court applied a per se rule of invalidity. My point is, so I guess it's not discriminatory on its face. So I suppose you could prove discriminatory purpose or effect. I don't know that there's much evidence on purpose, and I thought effect was certificates were denied between in-staters and out-of-states and equivalent percentages. Well, Your Honor, there is evidence that there was a discriminatory purpose, and the evidence is that the intervener and cabinet have conceded it. They argue that this system was designed to protect locally- It's not discrimination against out-of-staters. It's discrimination against new entrants, and those new entrants can be in-state or out-of-state. Well, the local providers that are basically the subset of favored providers being protected, according to the cabinet and the intervener, are locally subsidized businesses, which are, again, local and, in many cases, private, either non-profit or private for-profit. And thus, the interest itself is discriminatory, and the interest has been conceded. This is the design of the system, according to the cabinet. How does that make discrimination against out-of-state people? Because- You say they discriminate against everybody who's not an existing provider, but then you say, well, there's a purpose to discriminate against out-of-state potential providers. I mean, where does that additional out-of-state animus come from? The out-of-state animus is evidenced by the purpose that was asserted here, by the- The purpose is just to protect the existing ones, whether there's out-of-state people applying or not. I mean, I just don't follow you, that's all. Right, so the purpose that was- You don't have any evidence, do you, that in-state providers are more likely to get these certificates of needs than out-of-state providers? No, Your Honor, but that's not required, because the opposing counsel have conceded that there was a discriminatory purpose to the system, and that is to protect locally subsidized providers. Under Supreme Court precedent, Bacchus v. Diaz, once the government has conceded that there is a discriminatory purpose, the court need not inquire further as to whether Pike should apply or, say, Rule should apply. Okay, keep on saying locally. The discriminatory- I just see the purpose as incumbent, and if the incumbent was an out-of-stater or an in-stater, it wouldn't matter. So where's the evidence? The key adjective and statement you made for discriminatory purpose was to protect local providers, and I guess I'm not seeing the local- the evidence of the local part. Certainly, you're right, protection of incumbents, for sure, but that's not an interstate commerce- dormant commerce clause problem unless there's a purpose to discriminate between in-state and out-of-state. Well, this was explicitly argued in the Cabinet Intervenors Joint Brief, and that is that the primary interest of the common program is to protect locally subsidized providers. That is their argument, the 911 service providers. So you're saying that they're saying the state interest is that it could only be achieved by local providers because they're trying to subsidize these folks that wouldn't pay very much for the ambulance, in order for them to get the ambulance service. And you're saying that they're saying it has to be a local company that would do that. Right, so that is the sort of justification. But I think even if- But there's not really any evidence. You're just pointing to kind of an argument, a brief, really, right? Well, Your Honor, on the Supreme Court precedent, discriminatory purpose is enough to- Can I ask just a factual question? Now I understand. So your point is that the 911 operators are predominantly local, and the point is to protect the 911. Where is the evidence? I saw some references to counties. So some of these might be even government-run providers or 911 providers, so the emergency ambulances. Are those all local? Yes. As far as I can tell from the record, this argument was not raised until motion for summary judgment, so we weren't given the benefit of discovery on their particular claim. However, an examination of the applications and also on the expert testimony that they submitted reveals that there are, at least in the last 13 years, have been zero out-of-state providers that are subsidized by local governments and, in fact, zero providers that are even the primary 911 service. Does the same process apply no matter whether you're an emergency provider or a non-emergency provider? You go through this certificate of need process? Yes, Your Honor, and that goes to the Pike argument that we've raised, which is that there is actually no connection whatsoever between the asserted justification and the regulation in practice. As the record shows, the Cabinet has literally never decided an application based on the applicant's effect on local tax subsidies. 911 service providers are often protested and forced into non-compete agreements to have their applications approved. 911 service providers, it's happened at least eight times in the last 13 years. But once you get into that, would you agree that Pike is analogous to, at least my understanding of Pike, correct me if I'm wrong, as analogous to rational basis review? So it's a fairly deferential standard? It is a fairly deferential standard. If you're under rational basis review, you can be over-inclusive and under-inclusive, meaning you really just kind of have to go a little bit towards your intended target, even if there's other things that are undermining it in other ways. So if we were in strict scrutiny, I would think the notion that 911 providers are being harmed by this incumbency protection, that would be kind of useful evidence. But in rational basis review, I think the response would be, well, it's just under-inclusive, so it's not protecting to the full extent, and that's fine under that deferential standard. Well, Your Honor, the Pike test is not just a reformulation of the rational basis test. It is deferential, but it's not exactly the same. For example, defendants are required to assert some concrete interest. It cannot just be pure speculation. In several cases, the court has noted that defendants are not allowed to simply recite interests like public health and public safety, any sort of substantiation whatsoever. And I think that's what we have here, because there's nothing in the statute that requires special treatment of 911 providers. 911 providers are often forced to limit their services to 911 services and leave the non-emergency services to the incumbent providers, which, according to their own argument, would threaten the viability of the 911 system altogether. But the Cabinet has never once noted any concern in these cases that allowing this restriction of services to 911 services would threaten the viability or threaten access to 911 services or anything of the sort. There's simply no evidence whatsoever from the Cabinet record that this is a legitimate concern, and it's the only justification that was raised at the motion for summary judgment stage by defendants, and there doesn't seem to be any connection whatsoever. But even under a deferential Pike test, if you bring in the other health and safety justifications, there appears to be no connection at all between the regulation and those other health and safety justifications, whatever they are and as vague as they are. The need requirement that is being challenged here is completely standard list. There's no specific factors that the Cabinet must consider or give any particular weight to. The Cabinet hearing officers who were deposed for this case admitted that they decided these cases on an ad hoc basis, just based on whatever information is provided by the parties in every single case, an affected incumbent versus the prospective applicant. But the bottom line here is that an out-of-state company, the reason why there is a burden on interstate commerce here is because an out-of-state company can expect one of two outcomes. One, they can eventually enter into an agreement with an incumbent protester and have their application automatically approved, as has happened in every single case in the last 13 years. Or two, they can muddle through an onerous and expensive hearing process that can last upwards of two years and then at the end of the day still be rejected. An out-of-state company has only overcome a protest under the need requirement hearing processes only one time and in that one case they were able to show that the existing incumbent had horrific response times. People were having to take their own family members to the hospital because waiting for an ambulance service was dangerous and in fact in one case it led to death. But in every single other case, the out-of-state provider was either forced to enter into a non-compete agreement limiting their service area or their services to only the unprofitable runs or they end up getting their application. This case comes up to us on the grant of summary judgment in favor of the defendant. You also moved for summary judgment, did you not? That's correct. And your brief asks us to reverse and order summary judgment to be granted in your favor. That's correct. Is there any in-between remedy that might be appropriate here or is it just one or the other? If the court believes that there was not enough factual development to support either the claim under the Carbone or the claim under Pike, then the court could order further discovery and I think that would be... Did you cut off your discovery? Did you ask for more discovery and were not allowed it or what? We believe that the factual development is sufficient for this court to rule on the Carbone claim. Why should we permit further discovery if discovery proceeded, it closed, and it's over? I don't quite understand that. Did you file a motion for additional discovery below? We did not, Your Honor, because the argument that they raised that the justification was to support 9-1-1 service providers was not raised until motion for summary judgment after discovery had already been concluded. As I indicated before, I believe that the record is sufficiently full to have this court make a decision on that claim. But if not, I think that we should have an opportunity to conduct discovery on this particular defense and be able to proceed in the trial court as appropriate. Okay. Any further questions at this time, you'll have your rebuttal. All right, let's hear from the appellees. Good morning, Your Honors. May it please the Court, David Durr for the Intervening Defendant Appellee, First Care Ohio. Your Honors, I think Judge Murphy kind of hit the nail on the head in the beginning where he talked about the Carbone case. The Carbone case is not applicable here. It doesn't push this case into the first tier of dormant commerce clause analysis because in that case there was just a flat prohibition about out-of-state waste processors being able to operate. In this case, the appellants haven't offered any evidence of discrimination against out-of-state providers. The out-of-state providers and in-state providers have been approved at the same rates under the CON process. And there's just no evidence that they're being discriminated against. They all have an equal shot. In addition, you could even argue that out-of-state providers are being treated better than in-state providers because they are entitled to certain exemptions that in-state providers are not entitled to. What are those exemptions? So out-of-state providers can drive through the state without any CON or license. They can come in and drop individuals off in the state without a CON or license. And they can come and pick non-residents of Kentucky up and take them back to their home states without a CON or license. In-state providers would have to have a CON and license. But they are banned from taking Kentucky residents from Kentucky to out-of-state. That's right, Your Honor. And why doesn't the Buck case apply there to that scenario? Well, the Buck case, Your Honor, was under an old regime before the Pike test of this direct versus indirect doctrine. And this court has said in the Tennessee scrap case as well as the CSX case that that doctrine has been repudiated apparently. In addition, as the court pointed out below, this is a much more carefully drawn statute than what was at issue in the Buck case. And that, again, out-of-state providers are treated better than in-state providers. And this is an instance, you know, in the Buck case they were concerned about obstruction. This is, again, there's no obstruction of interstate commerce here. I would interpret Buck to establish the rule that states simply cannot deny an interstate route on the basis that there is sufficient competition for the interstate route. And that strikes me as applicable to the no matter. That's the interest you're arguing here, or the state is arguing, that there's just sufficient competition already in place. That's the competition that Buck at least suggests is simply an invalid state interest as applied to an interstate transportation. So unless Buck is disavowed or unless we can say that Buck has been overruled, it strikes me as directly on point. You know, I don't believe so, Your Honor. That case had to do with the use of interstate highways. This has to do with the use of interstate highways, at least as applied, of course. Well, this case has to do with providing ambulance services in the state of Kentucky. Not from Ohio to Kentucky, though. So there's both in Kentucky and then there's a claim that we should at least be allowed to go from Kentucky to Ohio. And the certificate of need denial suggests that there's sufficient competition to meet that need. And Buck says, no, states aren't allowed to engage in what is appropriate competition in interstate commerce. That's solely within Congress's domain. And maybe it's been, maybe it's a little in tension with other cases, but the Supreme Court has also given us clear marching orders that it's for them to overrule their cases and not for us. So I'm also troubled by the notion that we should just say, well, Buck has been overruled. The Supreme Court could say that, but it's told us that we're not supposed to do that. Well, Your Honor, again, the court has said in multiple cases that it's, this court has said in multiple cases that that doctrine has been repudiated. And it's antiquated doctrine that appears to have been replaced by the pipe. What cases in particular are you saying that we've said that? In the Tennessee scrap case, Your Honor, 556 at 449. The CSX case as well, 283 F3rd at 818. In that case, you know, they talk about, in the Buck case, Your Honor, the effect on commerce is not merely to burden it, but to obstruct it. Again, they're not obstructing it in this case. They're giving everybody a fair shot. And in addition, you know, we're talking about a very strong state interest here. We're talking about making sure that people have an ambulance come when they're in need of one and call 911. That's been a traditional state function. They talk about that in the pipe test, that when you talk about state safety of citizens and public protection, that's been a function that the state legislators have traditionally been entitled to legislate on, and they've been given to efforts by the court. I see my time is ending, so I will turn it over to counsel for Secretary Freelander. Good morning. Good morning, Your Honors. May it please the court, my name is David Lovely, and I'm here on behalf of the Commonwealth of Kentucky Cabinet for Health and Family Services, Secretary Freelander. And appellants here are dissatisfied from the district court ruling, and I think Judge Griffin, you hit on it, that we had competing joint motions for summary judgment. The judge at district court, Judge Manteno, found that our evidence that was presented outweighed any evidence. In fact, he was highly critical of any evidence that appellants put forth. And now appellants want to re-litigate, add to arguments, and frankly make some misrepresentations about fact. And it might be a mis- I think so, Your Honor. I think Pike is the test that needs to be applied in this case. And he did apply the appropriate Pike test and just came out in your favor on it? That's correct, Your Honor. That's correct. And I think Judge Manteno summed it up perfectly at the end of his order, where he says, even those basic information as how many ambulance transports of Kentucky residents from a location in Kentucky to another state occur annually, how many ground ambulances currently perform these kinds of transports, and how Kentucky compares to other states with similar or different requirements. And that's on page 21 of the order, page ID 5675. Well, under Pike, what do you do with the evidence? If your state interest is you want to cross-subsidize non-9-1-1, use the profits from non-9-1-1 services to subsidize 9-1-1 services, what do you make of the evidence that those providing 9-1-1 services have also been denied the certificate of need, so it's actually undermining that by harming them, by not allowing them to expand into the profitable context? Your friends on the other side suggest that completely undermines the interest, and they point to evidence in their brief to suggest that that has taken place. Do you understand the question? So if your interest is to subsidize 9-1-1 providers, you would think that they should get a free pass through the certificate of need so they can get into the lucrative non-9-1-1 services. But the agency has repeatedly obstructed their ability to do so. That would suggest to me that maybe you're not really trying to facilitate that interest, and this really is just about incumbency protection at large. I understand your question, Your Honor, and I think that it's a mischaracterization of the record beneath in the brief. And in the judge's order, he references tax subsidies, but he says it in a way that he says, let's take away the discussion of tax subsidies. Let's take that out of the mix, because what they argued at the district court level was an amount. Oh, our experts got the amount wrong of what tax subsidies might have to go into it. So the judge says, okay, let's take this out. And that is what they're picking on, saying that that was the benefit. But the benefit is services, a full spectrum of services. That includes 9-1-1. That includes non-emergent ambulances. In order, as our expert put in his report, that ambulances have to pull from many different varieties of runs in order to stay sustainable. And I don't think that any of us, I think it's fairly apparent on his face that the health and safety of the citizens of the Commonwealth is paramount. And having ambulance services, whether it be 9-1-1, whether it be non-emergent, whatever, BLS, ALS, whatever ambulance services they are, they need a company that is profitable or not, but they need a company to perform those services. How does restricting access? I mean, basic economics is you restrict supply, the price is going to go up and you're going to reduce supply. If you need more supply, why don't you allow entrance? I think it's a fair point when dealing with free market, Your Honor. But here we have a ceiling of what ambulances receive. This is a capitated market. Many, 55% of the runs that they make are Medicare patients. That's set by federal government. That's a set rate. They can't, an ambulance company, whether it be whoever has applied for a license, they have to accept what the government tells them that they're going to accept. And then with private pay, which is a very small amount, they have to negotiate with private pay, with insurance. And so oftentimes it's dependent upon what did they pick them up for? What was the call about? What did it turn out to be? That's why, again, as we point out— Why wouldn't an all-takers rule suffice? Because your concern is if you don't allow for this monopolization regime, the companies will just gravitate to the most profitable areas. But if you just establish a nondiscrimination rule, whoever calls you, you have to accept, no matter how much, whether it's Medicare or Medicaid or anything. That's what happens at most hospitals. Why wouldn't that suffice? And then at least you could compete within that domain. So that would remedy your concern that the 911 companies or the 911 patients would not have access. And I think, Your Honor, that, again, in this specialized market where there's varying payors that the ambulance must serve is different. It's not necessarily more ambulance is going to be better. If there were 50 ambulances, that doesn't necessarily solve a certain area's problem. In the Commonwealth, certainly where you have a varied population basis, you have mixes of urban, rural. You have very rural. You have very urban. And also, I think that that would be a solution best served for the legislature, Your Honor. And the Certificate of Need, it has been since, I believe, the early 80s is when it first came out, and it has been tinkered with and changed regularly. And certainly, but... That's another question I just generically had. How much does the underlying economics actually matter to the constitutional question? Like, do we have to make a determination whether this is actually good or bad for Kentuckians? Does that matter to whether it violates the Dormant Commerce Clause? The point is that there's a lot of... The experts disagree on a lot of the economics and whether it's going to actually increase access, increase income here. And I might, in a lot of respects, agree with your friends on the other side on some of this, but I'm not the fact finder. And I'm curious how this all relates, if at all, to the kind of interstate commerce question that's at issue. Sure. I think that, Your Honor, that the economics is a field that is best served for policy as opposed to the judicial. The CTS Corp says that... The Supreme Court and CTS Corp says that second-guess the empirical judgments of lawmakers concerning the utility of legislation is something the Court should not do. And, again, while economics vary and opinions do vary, and perhaps some of the literature that was put forth from a broad perspective about competition was put forth by their experts, the appellants' experts, but nothing in the record that was specific to Kentucky, that was specific to the ambulance market. In fact, their experts stated that the ambulance... There is no federal study done or statewide study done on ambulances alone. And with that, I'd just like to add that my time is up and I'm happy to answer any other questions, Your Honors. Any further questions? No. Thank you. Thank you very much, Your Honor. Mr. Polk, you've got three minutes rebuttal. Thank you, Your Honor. I'd like to note that, once again, that opposing counsel has reiterated the exact interest that was foreclosed by the Court in Carbone, the protection of local providers against other companies entering the market and supposedly burdening the revenues. The fact that Carbone dealt with a flat ban does not mean that the principle of Carbone only applies when there is a flat ban. There's, of course, many instances of the Supreme Court applying a per se rule of invalidity where there is much less than a flat ban, but rather a restriction on interstate commerce, as there is here. I'd also like to note that the economics here, even though economics are generally something that the legislature will discuss for policy, the economics here relate to the benefits and the burdens, which is part of the Pike balancing test. Here, I think that the plaintiffs have made a showing that Kentuckians are not served by this program, and, in fact, there's no connection at all between the program. Do we have to make an empirical assessment? If it's disserving Kentuckians, why wouldn't the answer there be, well, it's not affecting interstate commerce, it's just disserving Kentuckians, they can go to the legislature and say, you've got this monopoly law, it's just increasing pricing and reducing supply, it's harming us, change the law. Why would you come to the court instead? So the burden, it's not necessarily, the economics is about the effects on Kentuckians, not about interstate commerce. The harm to Kentuckians, as the plaintiffs and the appellants allege here, is a direct result of the restriction on interstate commerce, because companies are not allowed to come in and alleviate any shortages, or just enter an area to provide ambulance services, therefore they have less access. So that's where the evidence relates to the burden here, because these harms are a direct result of the burden on interstate commerce, as we've alleged here. In addition, as we noted before, the regulation, there's nothing in the regulation that specifically relates to health or safety, need is not defined in any way, the cabinet is not required to apply any factor or give any weight to any specific factor, they just decide on an ad hoc basis, and what you see is that incumbents have an outsized impact on whether an application is denied. If there is a protest maintained, the application will most certainly be denied. Counsel, you haven't mentioned Buck yet. Are you not relying on that? We are relying on that in our briefing, Your Honor, and I think that it does apply, and the Supreme Court has never overruled Buck, and I think the Sixth Circuit is still... Did the district court err in ruling that Buck had been abrogated? Yes, Your Honor, the Supreme Court has never overruled Buck, and in addition, the Supreme Court, sorry, the district court here, had indicated that this regulation would survive even Buck, because it was more well-crafted, but that was apparently generated by the district court itself, and there's nothing in the case law, either in the Supreme Court or Buck itself, that would suggest that if a more well-crafted regulation was in place, that it was immune from Commerce Clause analysis. The district court here did do a Buck analysis? Is that right? Is that what you said? At the very end of the decision, I believe, the court basically just said, Buck has been repudiated, and in any case, this is a better-crafted regulation than was in Buck, and therefore the Commerce Clause analysis doesn't apply or strike down this regulation. Okay. Any further questions? Thank you very much. All right, thank you. I believe that concludes the world argument docket this morning. You may adjourn the court.